## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | |
|---|---|
| F&M FINANCIAL CORPORATION,<br><br>*Plaintiff,*<br><br>v.<br><br>FEDERAL INSURANCE COMPANY,<br><br>*Defendant.* | )<br>)<br>)<br>)   Case No.: _____<br>)<br>)   Jury Demanded<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT

Plaintiff F&M FINANCIAL CORPORATION, for its Complaint against Defendant FEDERAL INSURANCE COMPANY (the "Defendant" or "Federal"), by and through its undersigned attorneys, hereby states as follows:

## NATURE OF THE ACTION

1.      This is an action for breach of contract and declaratory relief arising out of the Defendant insurance company's wrongful refusal to reimburse F&M Financial Corporation and its subsidiary F&M Bank (collectively, "F&M Bank") for F&M Bank's loss from a massive fraud perpetrated by a client, Osama M. El-Atari ("El-Atari"). The Defendant is the underwriter of the financial institution bond issued to F&M Bank and in place during the relevant time period. A financial institution bond is a form of insurance policy designed to cover losses due to certain dishonest, fraudulent and criminal acts committed by employees, customers or third parties and discovered during the period in which the bond is in effect.

2.      F&M Financial Corporation, for itself and all its subsidiaries, including F&M Bank, purchased from the Defendant the Financial Institution Forefront Security by Chubb

106273806

Community Bank Bond No. 82122797 DFI, effective for the Bond Period of March 14, 2007 to April 14, 2010 (the "Bond"). (Capitalized terms not otherwise defined in this Complaint have the definitions assigned in the Bond.) For purposes of this matter, the Bond has a $50,000 deductible amount and a $7 million Single Loss Limit of Liability applicable to Insuring Clause 15 ("Cyber Theft and Communication"), and a $2 million Single Loss Limit of Liability applicable to Insuring Clauses 4 ("Forgery or Alteration") and 5 ("Extended Forgery"), subject to the Bond's terms and conditions.

3.     During the Bond Period, F&M Bank discovered it had incurred a loss in excess of $8 million resulting from a loan it issued to El-Atari in March 2009 (the "Loss"). F&M Bank had believed that the loan was secured by the assignment of the cash value of a $20 million universal life insurance policy (the "Policy") issued to El-Atari by Lincoln Benefit Life Company ("LBL"), a subsidiary of the Allstate Corporation. Over six months after the loan closed, F&M Bank learned that the Policy was fraudulent and that El-Atari had been engaged in an elaborate fraud scheme.

4.     As part of his guilty plea to federal bank fraud and money laundering charges, El-Atari admitted under oath that he committed the fraud against F&M Bank and other financial institutions. In addition, El-Atari's fraud scheme has been confirmed by LBL in documents disclosed in connection with involuntary chapter 7 bankruptcy proceedings pending against El-Atari in the United States Bankruptcy Court for the Eastern District of Virginia, in which F&M Bank has filed a timely proof of claim for distribution from the estate.

5.     F&M Bank has written off the full amount of the loan and has submitted a claim under the Bond for payment of the Loss in the amount of $7 million. The Defendant has denied coverage and refused to pay F&M Bank's Loss. Accordingly, a real controversy exists between

the parties as to the obligation of the Defendant under the Bond to reimburse F&M Bank for its Loss.

## PARTIES

6.      Plaintiff F&M Financial Corporation is a corporation organized under the laws of Tennessee, with its principal place of business in Clarksville, Montgomery County, Tennessee. F&M Financial Corporation is accordingly a citizen of the State of Tennessee.

7.      On information and belief, Defendant Federal Insurance Company is a stock insurance company organized under the laws of Indiana with its principal place of business in New Jersey, and accordingly is a citizen of the States of Indiana and New Jersey.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(a)(1) and § 1332(c)(1), because the amount in controversy (exclusive of interest and costs) exceeds $75,000, and because there is complete diversity of citizenship of the parties.

9.      Venue for this action is proper in this Court pursuant to 28 U.S.C. § 1391(a)(2) because a substantial part of the events or omissions giving rise to the claim, including but not limited to F&M Financial Corporation's purchase of the insurance contract at issue and the events giving rise to F&M Bank's claim under the Bond, occurred in and around Clarksville, Montgomery County, Tennessee, or at other locations within the Nashville division of this judicial district.

## BACKGROUND

10.      F&M Bank purchased the Bond from the Defendant.  A true and correct copy of the Bond is attached as ***Exhibit A***.

3

11.     The Bond remained effective at all relevant times, including during the Bond Period of March 14, 2007 to April 1, 2010.

12.     Subject to its terms and conditions, the Bond provides insurance coverage to F&M Financial Corporation as the named Assured as well as to its subsidiaries, including F&M Bank.

13.     Generally, the Bond provides for payment of F&M Bank's losses resulting from various forms of fraudulent, dishonest or criminal acts committed by employees, customers or third parties that F&M Bank "discovers" during the Bond Period. The coverage provided by the Bond is specified in twenty-two Insuring Clauses covering various forms of dishonest, fraudulent and criminal acts.

14.     As is relevant to the Loss, and subject to its terms and conditions, the Bond has: (i) a $7 million Single Loss Limit of Liability subject to a $50,000 Deductible amount with respect to the Cyber Theft and Communication Insuring Clause (Insuring Clause 15.A, as modified by Endorsement No. 4 to the Bond); and (ii) a $2 million Single Loss Limit of Liability subject to a $50,000 Deductible amount with respect to the Forgery or Alteration and Extended Forgery Insuring Clauses (Insuring Clauses 4 and 5, respectively).

### Background on Osama El-Atari and F&M Bank's Loss

15.     F&M Bank is a regional bank serving the middle of Tennessee and southern Kentucky and is a subsidiary of F&M Financial Corporation.

16.     Upon information and belief, El-Atari is or was the primary owner of G.D.F., LLC, a limited liability company based in Ashland, Virginia, that owns and operates restaurant businesses in the Washington, D.C. suburbs.

4

17.     El-Atari was introduced to F&M Bank in or about February 2009 by Tony Oliphant ("Oliphant"). At that time, F&M Bank had recently hired Oliphant as a loan officer. Before he was hired by F&M Bank, Oliphant was chief loan officer at Clayton Bank & Trust Co. ("CB&T") in Knoxville, Tennessee. Upon information and belief, El-Atari was first introduced to Oliphant during his employment at CB&T. El-Atari became a client of Oliphant's and CB&T's, and borrowed several million dollars from CB&T before Oliphant resigned and joined F&M Bank, and before Oliphant introduced El-Atari to F&M Bank.

18.     In connection with his introduction to F&M Bank, El-Atari represented himself as a successful restaurateur and investor with a liquid net worth in excess of $59 million, who owned high cash value universal life insurance policies that he intended to leverage to fund an investment in a hotel development venture in Nashville, Tennessee.

19.     El-Atari requested an $8 million loan for the represented purpose of funding the hotel development investment. El-Atari proposed securing the loan by assigning the cash value of a universal life insurance policy purportedly issued to him by LBL, Flexible Premium Adjustable Life Insurance Policy No. 01T1815563, with a face value of $20 million and a cash surrender value of more than $15 million as of February 8, 2009.

20.     F&M Bank collected additional financial information relevant to El-Atari's loan request, including detail on his background, information on his overall financial profile including federal tax returns, and specific information relevant to the Policy intended as collateral.

21.     Additionally, before issuing the loan to El-Atari, F&M Bank conducted significant due diligence on El-Atari, which included credit checks, criminal background checks, internet searches and a review of materials related to El-Atari's businesses in Virginia. In addition, on information and belief, Oliphant had likewise been involved in conducting due

5

diligence on El-Atari in connection with CB&T's loans to El-Atari, including visits to his home and restaurant businesses, and meetings with his employees, business partners, family and friends. Part of Oliphant's duties as a loan officer with F&M Bank was to obtain required information and documents from his client or his client's representatives for F&M Bank's underwriting and credit administration process.

22.     In connection with its due diligence, F&M Bank also communicated by electronic mail with an individual representing himself as Chris Smith ("Smith"), an LBL representative with the authority to confirm the validity and cash surrender value of El-Atari's Policy, and to consent to the assignment of the Policy on behalf of LBL. By all indications, Smith appeared to F&M Bank to be a legitimate LBL representative, knowledgeable about the intricacies of El-Atari's Policy and LBL operations and procedures. Moreover, on information and belief, Oliphant had previously communicated with Smith by email and/or telephone in connection with CB&T's due diligence. Smith confirmed the genuineness and cash value of the Policy.

23.     Specifically, on or about February 12, 2009, El-Atari forwarded to Oliphant an email message that Smith sent to El-Atari stating that Oliphant had been cleared by LBL as an "authorized viewer" of the Policy. Email sent by Smith and received by F&M Bank shows Smith's email address as "csmith@lblifecompany.com."

24.     On or about February 12, 2009, Oliphant received an email from Smith, which he later forwarded to Nelson Boehms, F&M Bank's underwriter, and to Donna Lancaster ("Lancaster"), F&M Bank's Vice President in charge of central loan processing and compliance, in which Smith forwarded copies of a draft "Assignment Acknowledgement" and an "Assignment of Life Insurance Policy as Collateral" document. The email stated, verbatim:

> *From: csmith@lblifecompany.com [mailto: csmith@lblifecompany.com]*
> *Sent: Thursday, February 12, 2009 11:54 AM*

> To:  Tony Oliphant
> Cc:  Osama El-Atari
> Subject:  Mr. Osama El-Atari
>
> Mr. Oliphant
>
> I look forward to helping in any way I can.  Mr. El-Atari asked me to send
> you a copy of our latest version of Assignment of Life Insurance as
> Collateral Document and our Assignment Acknowledgement language
> that we attach to the banks bounded policy after the assignment is
> acknowledged by Lincoln.
>
> Regards,
> Mr. Chris Smith
> Customer Contacts Agent
> Lincoln Benefit Life Company
> (888) 918-9119
> (800) 867-5511
> 2940 South, 84th Street
> Lincoln, NE 68506-4142
> Please visit our website,www.LBLifecompany.com

25.     On or about February 25, 2009, in response to an email from El-Atari on which

Oliphant was copied, Smith sent an email to Oliphant describing the process by which F&M

Bank would obtain an assignment of the cash value of the Policy, as follows:

> From:  csmith@lblifecompany.com [mailto: csmith@lblifecompany.com]
> Sent:  Wednesday, February 25, 2009 11:33 AM
> To:  Tony Oliphant
> Cc:  oelatari@yahoo.com
> Subject:  Re:  Due process
>
> Mr. El-Atari-
>
> Please have the bank fill out the Assignment of Life Insurance as
> Collateral document that I have attached to this email.  They then can
> both scan and email you a copy with originals to follow.  After you receive
> the document filled out from your bank please print and sign in front of a
> notary in your local jurisdiction.  After you have completed the form
> please fax to Lincoln Benefit Life at (800) 867-5511 attention assignment
> office.  As soon as we receive it our security department will call you at
> your pre-designated numbers we have on file and ask you out [sic] pre-
> determined security questions to ensure the validity of the assignment.

*Once we have validated the assignment a new bound policy will be
produced and mailed to you and the bank. We do offer an expedited fee of
$150.00 if you would be interested. With the policy an assignment
acknowledgment will be included.*

*As for communicating with you [sic] legal department, no [sic] an issue,
please have Mr. El-Atari send me via [sic] authorization to speak to them
and I will accommodate accordingly.*

*Please note that I can only communicate via email for transparency
purposes.*

*If you have any questions or concerns' [sic] please don't hesitate to email
me back.*

*Regards,*

*Mr. Chris Smith*
*Customer Contacts Agent*
*Lincoln Benefit Life Company*
*(888) 918-9119*
*(800) 867-5511*
*2940 South, 84th Street*
*Lincoln, NE68506-4142*
*Please visit our website,www.LBLifecompany.com*

Oliphant forwarded Smith's February 25, 2009 email to Lancaster, who in turn forwarded it to

others in her department, who later forwarded the email to F&M Bank's in-house and outside

counsel.

     26.     On or about February 26, 2009, Oliphant sent a response to Smith's February 25,

2009 email, asking specific questions regarding the assignment of the cash value of the Policy

for El-Atari, as follows:

    *1.*    *In what form is the cash value of the Mr. El-Atari's policy held in?*
          *I.E. Cash, Cash Equivalent, Certain investment vehicles.*

    *2.*    *What is the method of assigning the policy to the bank?*

    *3.*    *How long does it take the bank to reclaim its collateral after a*
          *default and what is the process for obtaining these funds?*

8

4.  *Can the insured alter the policy in any way or form after the policy has been collateralized?*

5.  *Will we the bank become the beneficiary of the policy after the assignment? Are we co-owner?*

6.  *Will we the bank receive statements monthly, quarterly, bi-annually?*

7.  *How often does the insurance company deal with 3rd party banks to finance their clients?*

8.  *Why doesn't the insured just borrow the money from Lincoln directly?*

9.  *Once the assignment is assigned, and the loan fulfilled by the insured and paid in full, how do we the bank remove our assignment and return the collateral to the client? How secure is this and what measures does the insurance company take to make sure this action is truly [sic] the bank wishes?*

10. *What happens to the interest that the policy earns, does that fall under the assignment or does that go into the Cash Value of the policy?*

11. *How do we perfect our assignment? Is it necessary to have an acknowledgement from the State of Virginia to be perfected?*

Smith replied by email as follows:

*Mr. Tony Oliphant,*

*I will answer the questions below in the order they were received;*
*1. Mr. El-Atari's policy is held in cash, this is a direct request of Mr. El-Atari so that we may be able to assign the policy. It is LBL's policy to keep assigned cash value in cash and cash equiveint [sic] only.*

*2. I have included this in a previous email to you, dated yesterday February 25th 2009. I can re-send this to you if you did not receive it.*

*3. If Mr. El-Atari was to default with the bank and the bank felt the need to collect the cash value of the collateral, the bank would send a certified letter to LBL and make a claim. We at LBL would then call the bank to confirm the request and generate a claim number. Within five business days the claim would be fulfilled and a check would be mailed to the bank for the assigned amount no greater. Once the claim has been fulfilled and the funds collected by the bank we at LBL would then and only then remove the bank as the assigned party on the policy.*

9

4.      After the bound policy with the assignment acknowledgement has been distributed to the bank and the insured, the insured would not be able to modify, change or alter the policy in any way.  The bank would be the only party to be able to change any details on the policy, without the approval of the insured.

5.      The bank will become the beneficiary and the co-owner.  The bank becomes a peer of Mr. El-Atari.

6.      The bank will receive quarterly reports/statement [sic] and end of year statements.

7.      This is a very common practice to deal with third party financial institutions.

8.      As soon as Mr. El-Atari draws directly from LBL or borrows against his policy with LBL he will incur a Tax consequence.  Each individual tax consequence is different from person to person so I would not be able to comment on the amount or percentage.  FYI when the insured borrows any portion of the Cash Surrender Value from Lincoln they incur a tax consequence on the whole Cash Surrender Value.

9.      Once Mr. El-Atari has fulfilled the responsibility to the bank he would notify us, we would send a certified letter to the bank notifying them of the claim.  We would then request a copy of either the cancelled note or any proof of payoff.  At that point we would then hold the assignment for 30 days from receiving proof of pay off.  Only at that point would we then release the assignment.

10.     Interest earned accrues under the policies [sic] cash surrender value.  But the assignment is a constant figure so the interest would not increase the collateral.

11.     The assignment in its current form is our own document.  We have not had issues with it in the past.  If your council [sic] feels it would like to add language to better position the bank you may do so.  LBL must review it and approve or deny the changes.  I don't understand the question about acknowledgment from the State of Virginia?  Who or where in the state of Virginia would need to acknowledge that?  LBL is licensed nationwide to write policies in all 50 states and internationally.  I have never had to deal with a local jurisdiction or approval from the local jurisdiction to assign cash value of a policy to a third part financial institution.

If you have any questions or concerns' [sic] please don't hesitate to email me back.

Regards,

*Mr. Chris Smith*
*Customer Contacts Agent*
*Lincoln Benefit Life Company*
*(888) 918-9119*
*(800) 867-5511*
*2940 South, 84th Street*
*Lincoln, NE68506-4142*
*Please visit our website,www.LBLifecompany.com*

27.     Oliphant forwarded Smith's email to F&M Bank's loan processing department, stating as follows:

> *See below the answers to pertinent questions regarding the assignment of the life ins policy and the bank's status as to co-ownership of the policy and the procedure of re-payment in case of default. I am also going to send you the copy of the assignment from Lincoln Benefit and the email state that we can go ahead and proceed with the assignment, receive the binder, and have it reviewed by the attorney. Mr. El-Atari and Lincoln Benefit are ok with this process.*

28.     For El-Atari's loan request, the extent of the information F&M Bank collected and scope of the assessment it conducted was in accordance with F&M Bank's established lending practices and procedures.

29.     Based on the documents received by F&M Bank in connection with the loan, including the collateral assignment documents received from Smith and the Policy, F&M Bank received a legal opinion from F&M Bank's outside counsel dated March 6, 2009 (the "Opinion"). The Opinion concluded that (1) the Note and the proposed collateral assignment constitute a valid, legal and binding obligation of El-Atari, (2) the Assignment Acknowledgement received from Smith constitutes a valid and binding obligation of LBL and (3) the Collateral Assignment and Acknowledgement contain terms and provisions necessary for the F&M Bank, following a default by El-Atari, to exercise its right to surrender the Policy pursuant to the terms of the Policy.

11

30.     A purported original of the Policy was delivered to F&M Bank with acknowledgements of assignment from LBL before the loan was funded. The Policy appeared genuine in all respects.

31.     The Policy contained the signatures of Michael J. Velotta and Lawrence W. Dahl, whom the Policy identified as LBL's "Secretary" and "President," respectively. Additionally, a cover letter attached to the Policy and addressed to El-Atari confirming his purchase of the Policy is signed by Lawrence W. Dahl and identifies Dahl as the President of LBL.

32.     Based on El-Atari's representations, the due diligence and other investigation F&M Bank conducted, the confirmation from an individual who appeared to be an authentic LBL representative that the Policy was legitimate and its stated cash value correct, and the fact that the Policy appeared to genuine in all respects, F&M Bank issued the $8 million loan to El-Atari in March 2009.

33.     In connection with this loan, an agreement was executed between El-Atari and F&M Bank assigning $10 million of the cash value of the Policy to F&M Bank.

34.     As part of the closing process for the loan, El-Atari opened an account with F&M Bank into which he deposited funds sufficient to cover six months of interest payments on the loan. Interest payments were made on the loan from the account through September 2009.

35.     On information and belief, at some time between September 17, 2009 and October 12, 2009, Oliphant may have been informed by an individual outside of F&M Bank that El-Atari was missing and that there was likely a problem with the collateral for the loan. At the time, El-Atari was current on his loan payments. Oliphant located a news article on the internet stating that El-Atari had disappeared and describing frauds he had committed on a number of other banks by the use of fraudulent life insurance policies as collateral.

12

36.     On October 12, 2009, Oliphant informed William S. Stuard, Jr. ("Stuard"), F&M Bank's President, that there was a problem with the El-Atari loan. Stuard called a meeting of members of the Bank's management and counsel for the following day. During that meeting, F&M Bank searched for El-Atari's name on the internet using the Google search engine and located an article discussing El-Atari's fraud scheme on the website of the *Washington Post*. An attempt was made to call Chris Smith from the conference room telephone, but the telephone number was disconnected. Next, the Bank's counsel, Jonathan Vinson ("Vinson"), located and called LBL's main number, spoke to an actual LBL customer service representative and learned that although LBL had issued several life insurance policies to El-Atari, it had not issued a policy with the number on the Policy assigned to F&M Bank.

37.     Based on the information ascertained at the meeting, in F&M Bank's subsequent investigation and from materials disclosed in El-Atari's bankruptcy proceedings, F&M Bank believes that Smith is a fictitious person, and that none of the email communications from or representations by Smith actually issued from or were authorized by LBL. F&M Bank further believes that the copies of El-Atari's financial information and tax returns submitted in connection with the loan are bogus or altered.

38.     After September 2009, no further payments were made on El-Atari's loan, and the loan went in to default.

39.     Although LBL disclaimed the authenticity of the Policy, the Policy is an imitation of one or more valid original life insurance policies issued to El-Atari by LBL.

40.     Based upon LBL's position that the Policy was never issued to El-Atari and was not genuine, F&M Bank has been unable to collect El-Atari's outstanding debt by surrendering

13

the Policy assigned to it by El-Atari. As a result, F&M Bank has written off the full $8 million principal of the loan and outstanding interest.

41.     Upon information and belief, El-Atari defrauded at least six other banks located in Maryland, Ohio and Virginia in a similar fashion, and may have used some of the proceeds of the loan from F&M Bank in a "ponzi scheme" fashion. The total bank losses from El-Atari's fraud scheme reportedly total between $50 million and $100 million.

42.     After discovering El-Atari's fraud, F&M Bank filed a claim in the involuntary bankruptcy proceeding against El-Atari brought by several of the other defrauded banks. The bankruptcy is currently pending in the Eastern District of Virginia. It appears clear, however, that El-Atari dissipated tens of millions of dollars, and that only a small fraction, if any, of F&M Bank's loss may be recoverable in the bankruptcy process.

43.     El-Atari fled the United States. Soon after fleeing, El-Atari was indicted in the United States District Courts for the Northern District of Ohio and the Eastern District of Virginia on bank fraud and money laundering charges arising out of his scheme to defraud various banks in the manner described in this Complaint. After several months as a fugitive, El-Atari was apprehended in Texas. On April 29, 2010, El-Atari pleaded guilty in the criminal case pending in the Eastern District of Virginia.

44.     After El-Atari's arrest, Sissaye Gezachew ("Gezachew"), an employee of United Bank, one of the other banks El-Atari defrauded, was charged in the Eastern District of Virginia with conspiracy to commit bank fraud by supplying El-Atari with falsified documents that El-Atari employed in his fraudulent scheme. Gezachew pleaded guilty.

45.     On August 27, 2010, the court sentenced El-Atari to concurrent prison terms of 144 and 120 months, and ordered restitution of $30,447,423.57 payable to F&M Bank and other

banks that El-Atari defrauded in a similar manner. To date, F&M Bank has received no restitution payments from El-Atari.

46. On September 3, 2010, Gezachew was sentenced to a prison term of 30 months and ordered to pay restitution to United Bank.

### F&M Bank's Reporting of the Loss, its Cooperation with the Defendant and the Defendant's Denial of Coverage

47. After discovery of the Loss and in accordance with the terms and conditions of the Bond, F&M Bank timely reported the Loss to Federal by letter dated November 6, 2009.

48. On March 15, 2010, F&M Bank timely submitted to Federal a sworn Proof of Loss describing in detail the circumstances surrounding the Loss known to the Bank and the resulting investigation.

49. Federal acknowledged receipt of the notice of the Loss as well as F&M Bank's sworn Proof of Loss.

50. In a book of exhibits enclosed with its sworn Proof of Loss, F&M Bank provided Federal with numerous documents obtained directly from El-Atari or his representatives, in the subsequent investigation of the Loss and in discovery in El-Atari's bankruptcy proceedings. The book of exhibits to the Proof of Loss contained, among other things, copies of the LBL Policy, El-Atari's financial information and federal tax returns, F&M Bank's loan file and relevant email and correspondence between F&M Bank's representatives, El-Atari and his representatives, and Chris Smith. In addition, F&M Bank continued to submit additional relevant materials obtained through the bankruptcy process, including substantive pleadings and filings in the bankruptcy court and relevant evidence developed or disclosed in those proceedings, including the deposition testimony of El-Atari, certain third party witnesses and current and former F&M Bank personnel.

15

51.     Approximately six months after F&M Bank submitted its sworn Proof of Loss, Federal, through its counsel, requested a meeting with F&M Bank's management and counsel to ask questions concerning the Proof of Loss, F&M Bank's investigation, and to discuss potential coverage issues. Federal's counsel also sought to interview Oliphant, who is no longer employed by F&M Bank.

52.     In addition, F&M Bank has sought to mitigate its Loss by, among other things, prosecuting a claim in the El-Atari bankruptcy proceedings, obtaining an order of restitution in El-Atari's criminal case and preserving rights or pursuing claims against potentially liable third parties.

53.     To date, both orally and in writing, Federal has declared its intent to deny coverage under the Bond and refuse to reimburse F&M Bank's Loss.

## COUNT I:  DECLARATORY JUDGMENT

54.     F&M Bank incorporates be reference the preceding paragraphs as if fully set forth herein.

55.     An actual controversy exists between the parties with respect to the Defendant's obligation under the Bond to reimburse F&M Bank for its Loss.

56.     The Bond provides a number of bases under which F&M Bank is entitled to reimbursement by the Defendant of the full Single Loss Limit of Liability of the Bond of $7 million or, alternatively, $2 million, for its extension of credit to El-Atari on the faith of his false representations, the forged and/or altered Policy and the electronic and facsimile communications from a purported representative of LBL. Accordingly, F&M Bank seeks a declaration pursuant to 28 U.S.C. § 2201 that: its Loss is covered under the Bond; it has satisfied all conditions precedent to coverage under the Bond; and it is, therefore, entitled to immediate

16

reimbursement for its Loss of $7 million, which is the full Single Loss Limit of Liability of Insuring Clause 15.A of the Bond, or, alternatively, $2 million, which is the full Single Loss Limit of Liability of Insuring Clauses 4 and 5 of the Bond.

57.     Under Insuring Clause 15.A of the Bond (as set forth in Endorsement No. 4 to the Bond), the Defendant promised to pay:

> Loss resulting directly from the ASSURED having transferred, paid or delivered any funds or property, established any credit, debited any account or given any value:
>
> (1)     due to the fraudulent input of data either directly into the ASSURED'S Computer System or through a Network into the ASSURED'S Computer System;
>
> (2)     due to the fraudulent preparation or the fraudulent modification of Instructions;
>
> (3)     due to a Cyber-attack; or
>
> (4)     on the faith of any fraudulent Communication directed to the ASSURED and purporting to have been sent by a customer or the ASSURED, automated clearing house, custodian, or financial institution, but which communication was not sent by such person.

58.     A Communication is defined in the Bond to mean:

> An electronic record or message created, generated, sent, communicated, received or stored by electronic means that is capable of retention by the recipient at that time of receipt, including a Telefacsimile transmission or e-mail, and that was transmitted or purported to have been transmitted through a Network.

59.     A Network is defined in the Bond to mean:

> Any and all services provided by or through the facilities of any electronic or computer communication system, including Fedwire, Clearing House Interbank Payment System (CHIPS), Society for Worldwide Interbank Financial Telecommunication (SWIFT) and similar automated interbank communication systems, automated teller machines, point of sale terminals, and other similar operating systems and includes any shared networks, Internet access facilities, or other similar facilities for such systems, in which the ASSURED participates, allowing the input, output,

17

examination, or transfer of Data or programs from one computer to the ASSURED'S computer.

60.     F&M Bank's Loss is covered under Insuring Clause 15.A(4) of the Bond because it resulted directly from transferring, paying or delivering funds, or establishing credit, on the faith of fraudulent Communications directed to F&M Bank and purporting to have been sent by a financial institution (LBL).

61.     The collateral for the loan to El-Atari was a portion of the cash value of the LBL Policy exceeding the principal of the loan.  Accordingly, the ability to assign the cash value of the Policy was integral to the establishment of the credit, and F&M Bank made the loan to El-Atari on the faith of these Communications.  All of the Communications that were understood to have been made by LBL were delivered to F&M Bank by e-mail or fax, including substantive messages providing detailed information on the Policy and its cash value, the assignment process and LBL's consent to the assignment.

62.     LBL is a "financial institution" (a term not defined in the Bond) because, among other reasons, life insurance companies such as LBL and its parent Allstate are regulated by various provisions of Tennessee law along with other forms of companies providing financial services, such as banks.

63.     F&M Bank's Loss "resulted directly" from its extension of credit to El-Atari on the faith of the Communications purportedly from LBL because its ability to effectively investigate El-Atari's financial circumstances and underwrite the loan were completely thwarted by El-Atari's elaborate scheme, which F&M Bank discovered included the creation of false telephone numbers and internet domains designed to deceive F&M Bank's personnel into believing they were communicating with LBL directly.

18

64. As set forth herein and as further described in the sworn Proof of Loss F&M Bank submitted to the Defendant, F&M Bank's Loss resulted directly from its issuance of a loan on the faith of the fraudulent Communications purporting to be from LBL. For this reason, F&M Bank's Loss is covered under Insuring Clause 15.A of the Bond.

65. Under Insuring Clause 4 of the Bond, Federal promised to pay for:

Loss resulting directly from:

    a.     Forgery on, or fraudulent material alteration of, any Negotiable Instrument (other than an Evidence of Debt), Acceptance, Withdrawal Order or receipt for the withdrawal of Property, Certificate of Deposit or Letter of Credit, or

    b.     transferring, paying or delivering any funds or other Property, or establishing any credit or giving any value in reliance on any written instructions to the ASSURED authorizing or acknowledging the transfer, payment, delivery or receipt of funds or other Property, which instructions fraudulently purport to bear the handwritten signature of any customer of the ASSURED, financial institution, or Employee, but which instructions either bear a Forgery or have been fraudulently materially altered without the knowledge and consent of such customer, financial institution or Employee.

66. F&M Bank's Loss is covered under Insuring Clause 4 of the Bond because it resulted directly from a forgery on, or fraudulent material alteration of, one or more of the documents enumerated in Insuring Clause 4.a. For instance, the Bond defines a "Certificate of Deposit" as "an acknowledgment in writing by a financial institution of receipt of Money with an engagement to repay it."

67. The Policy provided by El-Atari as collateral for the loan issued by F&M Bank constitutes a Certificates of Deposit because it: (i) contains an acknowledgement in writing; (ii) by a financial institution (LBL); (iii) of receipt of Money (premiums paid by El-Atari); (iv) with an engagement to repay it (to surrender the cash value of the Policies upon termination

19

or at the request of the policyholder). The Value Summary for the Policy also meets these requirements when read in conjunction with the Policy.

68. Similarly, F&M Bank's Loss is covered under Insuring Clause 4.b. of the Bond because the Policy and related documents constitute "written instructions to the ASSURED authorizing or acknowledging the transfer, payment, delivery or receipt of funds or other Property, which instructions fraudulently purport to bear the handwritten signature of any customer of the ASSURED, financial institution, or Employee, but which instructions either bear a Forgery or have been fraudulently materially altered without the knowledge and consent of such customer, financial institution or Employee." The Policy contains an "Assignment Acknowledgment" form that specifically acknowledges the transfer of the cash value of the Policy from LBL to F&M Bank, and also states that the "'Bank' has requested this letter. . . ."

69. Because F&M Bank transferred funds and/or granted credit to El-Atari in reliance on written instructions covered under Insuring Clause 4.b., and, as set forth above, because such written instructions bear a forgery and/or have been fraudulently materially altered without LBL's knowledge, F&M Bank's Loss is covered under Insuring Clause 4.b.

70. F&M Bank's Loss is also covered under Insuring Clause 5 of the Bond. Insuring Clause 5 of the Bond provides coverage for:

> Loss resulting directly from the ASSURED having, in good faith, for its own account or the account of others:
>
> a. acquired, sold or delivered, or given value, extended credit or assumed liability, in reliance on any original
>
> (1) Certificated Security,
> (2) deed, mortgage or other instrument conveying title to, or creating or discharging a lien on, real property,
> (3) Certificate of Origin or Title,
> (4) Document of Title,
> (5) Evidence of Debt,

20

(6) corporate, partnership or personal Guarantee,
(7) Security Agreement, or
(8) Instruction which
  i. bears a Forgery, or
  ii. is fraudulently materially altered, or
  iii. is lost or stolen, or

b. guaranteed in writing or witnessed any signature on any transfer, assignment, bill of sale, power of attorney, Guarantee, or endorsement upon or in connection with any item listed in a.(1) through a.(8) above, or

c. acquired, sold or delivered, or given value, extended credit or assumed liability in reliance on any item listed in a.(1) through a.(4) above which is a Counterfeit Original.

71. F&M Bank's Loss is covered under Insuring Clause 5 because it resulted directly from F&M Bank's good faith extension of credit and/or giving of value in reliance on documents covered under and enumerated in Insuring Clause 5.

72. Specifically, by way of example, F&M Bank's Loss is covered because it gave value/extended credit on its good faith reliance on an original "Certificated Security" and/or "Security Agreement."

73. The Bond defines a "Certificated Security" as:

[A] share, participation or other interest in property of, or an enterprise of, the issuer or an obligation of the issuer, which is:

(1) represented by an instrument issued in bearer or registered form, and

(2) of a type commonly dealt in on securities exchanges or markets or commonly recognized in any area in which it is issued or dealt in as a medium for investment, and

(3) either one of a class or series or by its terms divisible into a class or series of shares, participations, interests or obligations.

74. The Policy constitutes a Certificated Security because the Policy satisfies the definition of that term as set out in the Bond and described above.

21

75.     The Policy also constitutes a "Security Agreement" covered under Insuring Clause 5. The Bond defines a "Security Agreement" as "an agreement which creates an interest in personal property or fixtures and which secures payment or performance of an obligation."

76.     The Policy was purportedly assigned to F&M Bank pursuant to an "Assignment Acknowledgment" form contained in the Policy and an agreement executed in connection with the assignment. The Policy thus created an interest for F&M Bank in the cash value of the Policy and secured the obligation of LBL to pay the cash value of the Policy to F&M Bank upon surrender of the Policy. As such, the Policy constitutes a "Security Agreement" as defined under the Bond.

77.     As set forth above, the Policy was not a genuine policy issued by LBL and thus contained fraudulent material alterations and/or forgeries at the time it was provided to F&M Bank to serve as collateral for the loan to El-Atari.

78.     F&M Bank accepted the Policy as collateral for the loan to El-Atari because the Policy appeared to have been originally issued by LBL to El-Atari, bore the apparent handwritten signatures of LBL's President and Secretary which appeared to be authentic and genuine on their faces, and in all other respects the Policy resembled an actual, valid LBL policy.

79.     The Policy was integral to F&M Bank's decision to issue the loan to El-Atari because it provided the collateral for the loan and thus served to protect F&M Bank's investment.

80.     As set forth herein and as further described in the sworn Proof of Loss F&M Bank submitted to the Defendant, F&M Bank's Loss resulted directly from its issuance of a loan in reliance on fraudulent electronic communications purportedly sent by LBL and on the Policy.

22

Because the Policy and related documents constitute documents covered under Insuring Clauses 4.a., 4.b. and 5 of the Bond, F&M Bank's Loss is covered under those Insuring Agreements.

## COUNT II:  BREACH OF CONTRACT

81.    F&M Bank hereby incorporates by reference the preceding paragraphs as if fully set forth herein.

82.    For the reasons stated above, which are incorporated by reference herein, F&M Bank's Loss is covered under Insuring Clause 15.A of the Bond.

83.    As described above, F&M Bank has satisfied all conditions precedent to coverage for its Loss.

84.    Because the Defendant is obligated to reimburse F&M Bank for its Loss up to the Single Loss Limit of Liability of the Bond but has refused to do so, the Defendant's repudiation of its obligations under the Bond and refusal to reimburse F&M Bank for its Loss constitutes a breach of its contract with F&M Bank.

85.    As a result of the breach, F&M Bank has suffered a monetary injury that totals more than $7 million.

## JURY TRIAL DEMAND

F&M Bank demand trial by jury as to all issues of fact triable by a jury.

## PRAYER FOR RELIEF

An actual and justiciable controversy exists as to each party's rights, duties, obligations and liability with reference to the above-described facts that should be determined and declared by judgment of this Court.

**WHEREFORE,** Plaintiff F&M Financial Corporation respectfully requests that this Court enter a judgment against the Defendant as follows:

A.     An Order from this Court declaring that, as a matter of law, F&M Bank is entitled to coverage and reimbursement of $7 million or, alternatively, $2 million, under the Bond as a result of the financial losses F&M Bank suffered directly resulting from its reliance upon certain communications in connection with the assignment of the cash value of a certain whole life insurance policy, offered by El-Atari as collateral for an $8 million loan, which were later revealed to have been fraudulent;

B.     Judgment against the Defendant and in favor of F&M Bank for the Defendant's breach of their insurance contract with respect to the wrongful denial of coverage for F&M Bank's Loss;

C.     Judgment against the Defendant and in favor of F&M Bank for compensatory damages, pre-judgment interest and post-judgment interest; and

D.     Judgment against the Defendant and in favor of F&M Bank for such other declaratory, equitable or further relief as this Court deems appropriate.

Respectfully submitted,

Gareth S. Aden (BPR #2371)
Jack W. Robinson, Jr. (BPR #11656)
GULLETT SANFORD ROBINSON & MARTIN PLLC
315 Deaderick Street, Suite 1100
PO Box 198888
Nashville, TN  37219-8888
 (615) 244-4994 Telephone
(615) 256-6339 Facsimile
gaden@gsrm.com
jrobinsonjr@gsrm.com

*Attorneys for Plaintiff, F&M Financial Corporation*

24